IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| LACEY BIRD and<br>ALISHIA EGENHOFF,<br><br>        Plaintiffs,<br><br>    v.<br><br>ALANSON M. RANDOL, D.D.S., P.C.,<br>*a professional corporation*, and<br>ALANSON M. RANDOL, *an individual*,<br><br>        Defendants. | Case No. 6:23-cv-01678-MC<br><br>OPINION AND ORDER |

MCSHANE, Judge:

Plaintiffs Lacey Bird and Alishia Egenhoff bring this religious discrimination action against their former employer, Defendants Alanson M. Randol, D.D.S., P.C. ("the Clinic") and Dr. Alanson M. Randol. Plaintiffs allege that Defendants violated Title VII of the Civil Rights Act and provisions of state law by terminating Plaintiffs when they declined, due to their religious beliefs, to be vaccinated against COVID-19.[1] Pls.' Compl., ECF No. 1.

Defendants now move for summary judgment on all claims. Defs.' Mot., ECF No. 19. Because Ms. Egenhoff cannot establish a sincerely held religious belief, and because the Defendants could not accommodate Ms. Bird's religious practices without experiencing undue business hardship, Defendants' Motion is GRANTED.

---

[1] This Court previously dismissed the claims brought by former plaintiff Makenzie Shaw-David. *See* Opinion and Order, ECF No. 12.

1 – Opinion and Order

## **LEGAL STANDARD**

On a motion for summary judgment, the moving party bears an initial burden to show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). When the moving party has met its burden, the non-moving party must present "specific facts showing that there is a genuine" dispute of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (quoting Fed. R. Civ. P. 56(e)). A dispute is considered "genuine" if the "evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it could affect the outcome of the case. *Id.* The court reviews evidence and draws inferences in the light most favorable to the non-moving party. *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 988 (9th Cir. 2006) (quoting *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999)).

## **BACKGROUND**

The following facts are undisputed.

### I.    The Defendants

The Clinic is a dental practice that operates out of a single office in Roseburg, Oregon. Dr. Randol is both the president of the Clinic and a dentist practicing at the Clinic. Compl. ¶¶ 3, 5. At the relevant time, the Clinic employed roughly 28 individuals—three dentists, seven or eight dental hygienists, seven or eight dental assistants, and seven or eight front desk employees. Morgan Decl. Ex. 1, at 3, ECF No. 20.

### II.    The Plaintiffs

Plaintiffs are former healthcare workers employed by the Clinic. Compl. ¶ 1. Ms. Egenhoff began working at the Clinic in 2009, and Ms. Bird began working at the Clinic in January 2012. Egenhoff Decl. ¶ 3, ECF No. 25; Bird Decl. ¶ 2, ECF No. 24. Both plaintiffs

regularly received glowing performance reviews and advanced to leadership roles within the Clinic. *See* Morgan Decl. Ex. 1, at 7, 10; Egenhoff Decl. ¶ 8; Bird Decl. ¶ 9. While Ms. Egenhoff started as a dental assistant, she later took on front office roles as a Marketing Director and then Front Office Team Lead. Egenhoff Decl. ¶ 4. Ms. Bird began as an entry-level employee in the front office and worked her way up to Front Office Team Lead. Bird Decl. ¶ 2. For each changing role, Dr. Randol testified that Plaintiffs continuously performed to satisfaction. Morgan Decl. Ex. 1, at 7, 10.

The Front Office Team Lead position was shared by three employees—Ms. Egenhoff, Ms. Bird, and former plaintiff Mackenzie Shaw-David. *Id.* at 8. Ms. Egenhoff was the Director of Operations, and Ms. Bird was the Director of Training and Development. Egenhoff Decl. ¶ 4; Bird Decl. ¶ 2.

### III.    The Pandemic

In response to the COVID-19 pandemic, Dr. Randol implemented significant changes to the Clinic's operations, including installing plexiglass barriers, requiring employees to take a temperature test upon entry, and providing employees with PPE like face shields or N95 masks with protective eyeglasses. Randol Decl. ¶ 4, ECF No. 21. In making these changes, Dr. Randol followed the recommendations and requirements of state and federal agencies and the American Dental Association. *Id.*

In August 2021, the Oregon Health Authority ("OHA") implemented an administrative rule requiring all workers in healthcare settings to be vaccinated against COVID-19 or have a documented religious or medical exemption. Or. Admin. R. 333-019-1010. Being subject to the rule, Dr. Randol initially granted religious exceptions for 14 members of his staff, meaning roughly half of the staff at the Clinic was continuing to work unvaccinated. *See* Morgan Decl.

Ex. 1, at 12. Plaintiffs were among the employees who applied for and were granted religious exceptions. Bird Decl. ¶ 6; Egenhoff Decl. ¶ 13.

In January 2022, Dr. Randol decided that unvaccinated employees would no longer be accommodated. Randol Decl. ¶ 8. He sent out an email to the Clinic's employees, notifying them that the Clinic's updated COVID-19 policy would require that *all* employees be vaccinated. *Id.* at ¶ 9; Randol Decl. Ex. 2, at 1 (emphasis added). The email also explained that, under this new policy, any employee who was not vaccinated or had not started their vaccination process by January 30, 2022, would be terminated. Randol Decl. Ex. 2, at 1. Plaintiffs told Dr. Randol that they would not be getting vaccinated, and they were subsequently terminated. Bird Decl. ¶ 8; Egenhoff Decl. ¶ 17.

Ms. Egenhoff did not request any workplace accommodation in response to the Defendants' updated COVID policy. Morgan Decl. Ex. 3, at 27. Ms. Bird asked to be allowed to work remotely; Defendants denied that request. Morgan Decl. Ex. 1, at 13.

IV. **The Claims**

Defendants terminated Plaintiffs' employment on January 30, 2022. Plaintiffs subsequently filed this action on November 14, 2023, asserting three claims against Defendants. Against the Clinic, Plaintiffs bring claims for failure to accommodate in violation of Title VII of the Civil Rights Act and religious discrimination in violation of ORS 659A.030(1)(a).[2] Against

---

[2] Plaintiffs' Complaint pleads a Title VII failure-to-accommodate claim. Pls.' Compl. 9. Defendants are on notice for only that. Despite this, Plaintiffs raise Defendants' possible discriminatory motives as a disputed issue of material fact sufficient to defeat summary judgment. Pls.' Resp. 19, ECF No. 23. While a disparate treatment Title VII claim requires a plaintiff to establish circumstances giving rise to an inference of discrimination, a failure to accommodate claim has no such element. *See Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 603 (9th Cir. 2004); *see also Lavelle-Hayden v. Legacy Health*, No. 3:22-cv-01752-IM, 2024 WL 3822712, at *7–8 (D. Or. Aug. 14, 2024) (explaining the same to Plaintiffs' Counsel in a separate case). Plaintiffs are correct that where an employer's claimed "undue hardship" is attributable to animosity towards a religion, Title VII is not satisfied. *See Groff v. DeJoy*, 600 U.S. 447, 472 (2023). However, whether this is Plaintiffs' only point is unclear because Plaintiffs repeatedly cite case law analyzing disparate treatment claims and apply the reasoning to this matter. To the extent Plaintiffs are attempting to merge the two theories of liability, such is improper at this late stage.

4 – Opinion and Order

Dr. Randol, Plaintiffs bring a claim for aiding and abetting religious discrimination in violation of ORS 659A.030(1)(g).

## ISSUE[3]

Defendants move for summary judgment on all claims brought by Plaintiffs. Defendants argue, for both the Title VII and Oregon religious discrimination claims, that (1) Plaintiffs have failed to establish a prima facie case of religious discrimination and (2) even if Plaintiffs have managed to establish a prima facie case, Defendants prevail as a matter of law on the affirmative defense of undue hardship. Defendants further argue that Plaintiffs' aiding and abetting claim necessarily fails because it relies on the religious discrimination claim.

Taking each claim in turn, the Court agrees that Defendants are entitled to judgment as a matter of law.

## DISCUSSION

I. **Title VII Claims**

Title VII of the Civil Rights Act of 1964 makes it unlawful for employers to terminate an employee because of the employee's religious beliefs. 42. U.S.C. § 2000e–2(a)(1). Under the Act, employers must "reasonably accommodate" the religious needs of employees whenever it would not result in an "undue hardship on the conduct of the employer's business." §2000e(j). Courts analyze such "failure-to-accommodate" claims under a two-part, burden-shifting framework. *Tiano v. Dillard Dep't Stores, Inc.*, 139 F.3d 679, 681 (9th Cir. 1998). First, a plaintiff must plead a prima facie case of religious discrimination by establishing "that (1) she had a bona fide religious belief, the practice of which conflicted with an employment duty; (2) she informed

---

[3] The Court is also in receipt of Defendants' evidentiary objections. *See* Defs.' Rep. 2–3. Nothing in this Opinion and Order relies on inadmissible evidence or evidence not properly entered on the record.

her employer of the belief and conflict; and (3) the employer threatened her or subjected her to discriminatory treatment, including discharge, because of her inability to fulfill the job requirements." *Id.* Second, if the plaintiff articulates a prima facie case of religious discrimination, the burden shifts to the employer to show either that it made a good-faith effort to reasonably accommodate the plaintiff's religious practices or that it could not accommodate the plaintiff without undue hardship. *Id.*

### A. Plaintiffs' Prima Facie Cases

Here, Plaintiffs' conflict arises in the first prong of their prima facie burden. Defendants do not challenge the sincerity of Plaintiffs' religious beliefs, nor that each Plaintiff informed the Defendants of these beliefs and were proximately discharged. Defs.' Mot. 14. Rather, Defendants argue that Plaintiffs have failed to establish how their religious beliefs conflicted with the vaccine requirement, and therefore they cannot satisfy the first element of their prima facie cases. As to Ms. Egenhoff, the Court agrees.

"Title VII does not protect secular preferences." *See Tiano*, 139 F.3d at 682. While a plaintiff's burden to allege a religious conflict with an employment duty is minimal, a plaintiff's conclusory assertions of violations of their religious belief need not be taken at face value. *See Bolden-Hardge v. Off. of the Cal. State Conroller*, 63 F.4th 1215, 1223 (9th Cir. 2023). A plaintiff making a "threadbare reference" to their religious beliefs is also insufficient to satisfy the first element of their prima facie case. *See Gage v. Mayo Clinic*, No. CV-22-02091-PHX-SMM, 2023 WL 3230986, at *3 (D. Ariz. May 3, 2023).

### 1. Ms. Egenhoff

In her letter to Defendants, Ms. Egenhoff provided the following basis for her religious exception request:

6 – Opinion and Order

> I have been a Christian for many years. As a believer in Jesus, the Holy Spirit lives in me. Jesus said the Holy Spirit will guide each person who repents of their sin and believes upon Him into all truth. I seek God's will for my life through prayer, reading the Bible, and relying on the power of the Holy Spirit to help me to do God's will. I believe God's promise that "if anyone lacks wisdom, let him ask of God, who gives to all liberally." (James 1:5) I have prayed about how to respond to the COVID vaccine directive in light of my religious beliefs. As I have prayed, the Holy Spirit has moved on my heart and conscience that I must not accept the COVID vaccine. If I were to go against the moving of the Holy Spirit, I would be jeopardizing my relationship with God and violating my conscience.

Egenhoff Decl. Ex. A, at 1.

At her deposition, Ms. Egenhoff was again asked why she chose not to receive a COVID vaccine. She offered the following: "I don't need it. . . . I asked God for guidance on this subject, as in my letter states, and I don't - - I don't need it. I have never felt the need to have it." Morgan Decl. Ex. 3, at 9. She continued, "I prayed about it originally when I was put in a position to take it or not, and I've prayed about it multiple times since then, and every time I have been led to the answer is no." *Id.* at 10. When asked specifically how she knew she was "led" to the answer, Ms. Egenhoff said she felt "the spirit guiding [her]," in that every part of her body and mind "says no." *Id.* When asked why she felt a religious conflict with the COVID vaccine but not the other 13 vaccinations she received, Plaintiff stated that COVID was new, "something that the world hadn't seen before." *Id.* at 26. On the specific bible verse she cited, Ms. Egenhoff acknowledged that after googling examples of religious exemption requests, she "saw it in another example, and [she] felt that it was relevant." *Id.* at 29. Additionally, Ms. Egenhoff testified that she does not believe the vaccine is effective or safe and that she fundamentally disagreed with government-mandated vaccinations. *Id.* at 10–12.

7 – Opinion and Order

Omitting Ms. Egenhoff's many secular objections leaves this Court with only her assertion that prayer moved her not to receive the vaccine. She offers this Court no further explanation as to how the core tenants of her Christian beliefs or any specific religious convictions contravene receiving the vaccine. In grappling with the outpour of these types of cases, courts in this District have attempted to walk a fine line between not discounting one's interpretation of their own faith, while also requiring more than broad statements of religious opposition, so as to preserve the intended boundaries of Title VII. *See generally*, *Coates v. Legacy Health*, No. 3:23-CV-00931-JR, 2024 WL 1181827, at *4 (D. Or. Jan. 8, 2024). Consistent with that, this Court concurs with others that Title VII cannot be interpreted to require an employer to accommodate an objection simply because that objection was couched in religious terms or arrived at through prayer. *See Geerlings v. Tredyffrin/Easttown Sch. Dist.*, Civil Action No. 21-CV-4024, 2021 WL 4399672, at *7 (E.D. Pa. Sep. 27, 2021) ("[r]eligious adherents often profess that faith inspires much of their secular lives, but those activities are still secular"); *see also Hurley v. Varian Med. Sys.*, No. 23-CV-42, 2024 WL 2368438, at *5 (E.D. Wis. May 23, 2024) ("An employer is not required to accommodate an employee's opinion or decision merely because the employee arrived at it through prayer. Religious persons may reach many important decisions through prayer, but that does not turn every important decision into a matter of a sincerely held religious belief."). Without illuminating an articulable conflict, Ms. Egenhoff's choice to pray over a medical decision does not alone transform it into a religious one, subject to the protections of Title VII. While the Court does not deny that Ms. Egenhoff holds bona fide Christian beliefs, her prima facie burden demands more than merely asserting she prayed, reflected, and felt vaguely compelled to choose one choice or another.

As a final note, Ms. Egenhoff makes a belated attempt to bolster her prima facie case by highlighting her mention of "the mark of the beast" in one response to Defendants' interrogatories. *See* Morgan Decl. Ex. 4, at 3. That mention simply establishes Ms. Egenhoff's knowledge of the Book of Revelations. It does not connect the prophetic "mark" to the COVID vaccine or otherwise specify how the two conflict.

   2. **Ms. Bird**

By contrast, Ms. Bird's exception request quoted multiple passages from the Bible, including Corinthians 3:17, which Plaintiff understands to prohibit "controversial ingredients" from entering her body. Randol Decl. Ex. 4, at 1. At her deposition, Ms. Bird clarified that this concern related to her discovery of "several publications that cited fetal cells" as ingredients. Morgan Decl. Ex. 2, at 20–21. Because Ms. Bird's "religion believes in life at conception, . . . using aborted fetal cells would go against [her] beliefs." *Id.* at 39. Likewise, Ms. Bird referenced the Book of Revelations in her request letter as well. Randol Decl. Ex. 4, at 1. However, unlike Ms. Egenhoff, Ms. Bird extrapolated at her deposition, explaining that the circumstances of the pandemic were "strikingly similar to what is depicted in the Bible" such that she believes the vaccine mandate to be "a precursor to what happens in the book of Revelations." Morgan Decl. Ex. 2, at 30. For similarities, Ms. Bird referenced the present-day inability to fly, travel, work, make money, and go to the grocery store. *Id.* at 32.

Defendants are unpersuaded, highlighting for the Court multiple excepts from Ms. Bird's exception request and testimony that reflect secular opinions. *See* Morgan Decl. Ex. 2, at 13 (Ms. Bird explaining she objected to the vaccine because of safety: "Statistics that are provided by the vaccine companies that say that you can absolutely have a reaction or death."); *id.* at 17 (Ms. Bird explaining that her "religious beliefs and [her] political beliefs kind of have some

intertwining" and that she felt it was wrong for the government to mandate a vaccine); *id.* at 19–20 (Ms. Bird explaining that "one of the reasons that [she] didn't want to receive the COVID vaccine" was that she "already had it" and therefore had "natural immunity"); *id.* at 22 (Ms. Bird stating that she arrived at her decision by listening to "several pastors," "prayer and thought," and "guidance from the spiritual leader of [her] household, . . . [her] husband."); *id.* at 29 (Ms. Bird elaborating on what ingredients she felt were "harmful" and saying: "It's my understanding that some of the ingredients can be toxic, hence adverse reactions, complications such as that. . . I don't remember specifically. . . . But I do remember reading them and thinking yikes.").

Defendants point is well taken. There is ample evidence from which a jury could conclude that Ms. Bird's choice to abstain from the vaccine was secularly rather than religiously motivated. Further, courts are increasingly concluding that although the belief one's body is a temple may be religious, the conclusion that the COVID vaccine is harmful to that temple is fundamentally a medical judgment. *See Coates*, 2024 WL 1181827 at *5 (collecting cases).

Nonetheless, mixed in with her secular opinions, Ms. Bird also provides Christian-based beliefs which purportedly compelled her refusal of the vaccine. Because Ms. Bird has demonstrated a genuine dispute of fact as to whether her request was "purely based" on nonreligious concerns, her prima facie case survives summary judgment. Her Title VII claim therefore continues to the second part of the analysis: Defendants' affirmative defense of undue hardship.

B. **Defendants' Undue Hardship**

Defendants argue that they could not accommodate Ms. Bird because both allowing Ms. Bird to work entirely remotely and allowing her to work in the Clinic unvaccinated would have caused their business undue hardship. The Court agrees.

An employer is not required to accommodate an employee's religious beliefs if doing so would impose "undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j). To establish undue hardship, "an employer must show that the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business." *Groff v. DeJoy*, 600 U.S. 447, 470 (2023). Courts consider "all relevant factors in the case at hand, including the particular accommodations at issue and their practical impact in light of the nature, 'size and operating cost of [an] employer.'" *Id.* at 470–71 (alterations omitted) (internal quotation marks omitted). When conducting the kind of fact-specific, context-based analysis required by *Groff*, the following factors may be relevant: (1) the economic and non-economic costs of the accommodation; (2) the information available at the time the defendant determined what, if any, accommodation would be made; and (3) the aggregate or cumulative effects when the same accommodation is requested by multiple, similarly situated employees. *See Lavelle-Hayden*, 2024 WL 3822712, at *8–11 (further explaining the appropriateness of these factors).

   1. **Remote Work**

Defendants argue that allowing Ms. Bird to work remotely would have caused the Clinic undue hardship. Defs.' Mot. 22. It is not in dispute that parts of Ms. Bird's job required her to be in person; Ms. Bird acknowledged that she could perform *many but not all* the duties of her job remotely. Morgan Decl. Ex. 2, at 10–11, 39–40 (emphasis added). She had the capacity and was allowed on occasion to conduct some of her work from home; for instance, after she gave birth to her son and in the early days of the COVID-19 pandemic. *Id.* at 10. An ability to occasionally conduct some work remotely, however, is not what is at issue here.

Dr. Randol stated that, "if [the Plaintiffs] were in a situation where they were working completely at home, that is going to put a lot more undue pressure on the people who were at the office. So we needed a certain amount of people face-to-face working with patients." Morgan Decl. Ex. 1, at 11. He further explained that the Plaintiffs "were needed to help with the flow of the office as far as patients coming in and dealing with them on a face-to-face basis." *Id.* at 13.

When asked during her deposition how many other individuals were trained to cross over and perform multiple administrative duties, Ms. Bird said she could only recall herself and the other Front Office Team Leads being so trained. Morgan Decl. Ex. 2, at 9. All three employees in the Front Office Team Lead position requested an exception to the vaccine requirement, as had half the Clinic's staff. Morgan Decl. Ex. 2, at 9; Morgan Decl. Ex. 1, at 12. If the Clinic granted the requests of Ms. Bird and similarly situated employee to work remotely, the on-site duties of the Front Office Team Lead role would have been eliminated, and the Clinic would have faced a shortage of staff to take on patient-facing duties.

Ms. Bird's statement that allowing her to work remotely "would have been an easy transition, as there would have been minimal changes and no expenses foreseen to allow [her] to work from home" fails to raise a genuine dispute that allowing her to work remotely would have created an undue hardship for Defendants. Bird Decl. ¶ 8.

### 2. Unvaccinated Workers in the Office

Defendants further argue that having unvaccinated employees, like Ms. Bird, in the office would have created an undue hardship for the Clinic by substantially increasing the health and safety risks to patients and staff. Defs.' Mot. 22. In support of this defense, Defendants offer the declaration and deposition testimony of Dr. Randol as well as OHA publication that Dr. Randol reviewed. Ms. Bird argues that Defendants would not have suffered undue hardship because the

precautions already in place were sufficient to reduce any health and safety risks and vaccines would not have helped in further reducing those risks. *See* Pls.' Resp. 28–29. Ms. Bird provides no evidence in support of these claims.[4] Nonetheless, because undue hardship is Defendants' affirmative defense, the Court must view the facts in the light most favorable to Ms. Bird.

    The Clinic is a medical facility serving many patients. Randol Decl. ¶ 3. Among the Clinic's patients are people of vulnerable populations, including children, the elderly, and people with pre-existing medical conditions. *Id.* In response to the COVID-19 pandemic, Defendants made significant changes to the operations of the Clinic, including safety procedures like installing plexiglass barriers, requiring employees to take a temperature test upon entry, and providing employees with PPE. *Id.* at ¶ 4. These changes were made in deference to state and federal agencies' recommendations, including the American Dental Association. *Id.* Despite some employees getting vaccinated and the Clinic continuing to follow safety procedures like masking and using plexiglass barriers, Defendants' employees were still becoming infected with COVID-19. Morgan Decl. Ex. 1, at 4.

    From December 2021 to January 2022, Dr. Randol reviewed information about evolving COVID-19 risks. Randol Decl. at ¶ 7. The information Dr. Randol reviewed indicated that the Omicron variant was emerging and especially transmissible. Randol Decl. ¶ 6, 7; Randol Decl. Ex. 1, at 2. Additionally, Dr. Randol learned that there is an acute risk of COVID-19 transmission in dental practices because of the length of time patients sit unmasked with their mouths ajar. Randol Decl. ¶ 7. Based on information from the Center for Disease Control and Prevention and OHA, Dr. Randol believed that the vaccine would be effective against COVID-19 and the

---

[4] The Court did not consider Plaintiffs' reference to a statement made in July 2021 by then-CDC Director Rochelle P. Walensky when making its decision. The fact that this statement does not create a genuine dispute of fact as to the efficacy of COVID-19 vaccines has already been addressed by other courts. *See e.g., Lavelle-Hayden*, 2024 WL 3822712, at *16.

13 – Opinion and Order

Omicron variant specifically. Morgan Decl. Ex. 1, at 17. Dr. Randol concluded that having unvaccinated employees working in person posed significant risks to the health and safety of everyone at the Clinic, and that the safety procedures then in place could not sufficiently address those risks. Randol Decl. ¶ 8. Accordingly, Dr. Randol sent an email to the Clinic's staff on January 22, 2022, explaining that all employees needed to receive the vaccine by the end of the month, or they would be terminated. Randol Decl. ¶ 9; Randol Decl. Ex. 2, at 1.

      Defendants have established that the measures taken at the Clinic were reasonable and that allowing Ms. Bird to work unvaccinated in the Clinic during the emergence of new COVID-19 variants would have created an undue hardship. Defendants were responsible for the health and safety of their patients and staff during an unpredictable time and, based on the information that was available to them, Defendants reasonably believed new COVID-19 variants to be a significant threat. Defendants initially tried to provide accommodation by allowing in person work with adherence to certain safety precautions like masking and barriers. However, employees continued to contract the disease, and data about emerging variants suggested that the number of infections would increase. With roughly half of the Clinic's employees unvaccinated, Defendants also reasonably concluded that the cumulative cost of accommodating them all would be substantial.

      Ms. Bird fails to raise a genuine dispute of material fact because she merely argues, without providing any evidence to substantiate the claim, that the COVID-19 vaccine does not prevent transmission. *See Hailey v. Legacy Health*, No. 3:23-CV-00149-IM2024 WL 4253238, at *15 (D. Or. Sept. 20, 2024) (citing *Isaac v. Exec. Off. of Health & Hum. Servs.*, No. 22-11745-RGS, 2023 WL 8544987 (D. Mass. Dec. 11, 2023)). This is insufficient to rebut Defendants' established affirmative defense. Ms. Bird's Title VII claim therefore fails the second prong.

### 3. Oregon Religious Discrimination Claims

Courts generally analyze religious discrimination claims under ORS § 659A.030 and Title VII together because the standard for the two are substantially similar. *Tornabene v. Nw. Permanente, P.C.*, 156 F. Supp. 3d 1234, 1242 (D. Or. 2015).

#### a. Religious Discrimination against the Clinic

Defendants are entitled to judgment as a matter of law as to Ms. Egenhoff's state law religious discrimination claim for the same reason as for her Title VII claim—she failed to make a prima facie case for religious discrimination. Likewise, Ms. Bird's state law religious discrimination claim fails because Defendants have demonstrated that accommodating Ms. Bird would have caused an undue hardship.

#### b. Aiding and Abetting against Dr. Randol

ORS § 659A.030(1)(g) makes it unlawful for someone to aid and abet the religious discrimination prohibited in § 659A.030(1)(a). Because Plaintiffs' underlying religious discrimination claims against the Clinic fail, so too does their aiding and abetting claim.

## CONCLUSION

For the reasons stated above, Defendants' Motion for Summary Judgment, ECF No. 19, is GRANTED.

IT IS SO ORDERED.

DATED this 19th day of February 2025.

                                                        s/Michael J. McShane
                                                          Michael J. McShane
                                                 United States District Judge